HOWARD S. TELLER AND MEI-LI TELLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Teller v. Commissioner
Docket No. 20317-88
United States Tax Court
T.C. Memo 1992-402; 1992 Tax Ct. Memo LEXIS 424; 64 T.C.M. (CCH) 166; July 15, 1992, Filed *424 Decision will be entered under Rule 155. P held stock in two domestic corporations which were engaged in design, manufacture, and sale of electronic products. The products were manufactured or fabricated in the Far East. After experiencing some success, P attempted to sell his products to a domestic chain of nationwide retail electronics outlets. The retailer, as a matter of business policy, would not purchase products manufactured in the Far East from a domestic company. The domestic corporations formed foreign subsidiaries with which the national retailer began doing business. The business and assets of the domestic corporations decreased in amounts inversely proportionate to the increases in the foreign subsidiaries. P, due to poor health, sought to and did sell his interest in the domestic corporations and his rights in other related assets, including patents necessary to the success of the business. R determined that the domestic corporations were availed of principally to hold the stock of the foreign subsidiaries and that sec. 1248(e), I.R.C., triggered the applicability of sec. 1248(a), I.R.C.Held, The phrase "availed of principally" defined for purposes of sec. *425 1248(e), I.R.C.Held, further, P is taxable on a portion of the sales proceeds as dividends at ordinary income rates pursuant to sec. 1248, I.R.C.
For Petitioners: Robert E. Kolek and Daniel L. Kraus. For Respondent: Vijay S. Rajan and William T. Derick. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined a $ 616,498 income tax deficiency for petitioners' 1983 taxable year. Respondent also determined additions to tax of $ 30,825 under section 6653(a)(1) [1] and $ 154,125 under section 6661. If section 6653(a)(1) is applicable, then section 6653(a)(2) would also be applicable requiring, pursuant to respondent's determination, liability for 50 percent of the interest due on any deficiency in income tax that may be finally redetermined. By an amendment to her answer, respondent asserts that section 6621(c) regarding increased interest for tax-motivated transactions is applicable and is seeking increases in the deficiencies, as follows: Income tax -- increase of $ 318,756.10 to a total of $ 935,254.10, the section 6653(a)(1) addition to tax -- increase of $ 15,937.70 to a total of $ 46,762.70, and the section 6661 addition to tax *426 -- increase of $ 79,688.53 to a total of $ 233,813.53. The issues for our consideration are: (1) Whether either of two domestic corporations was availed of principally for holding stock of foreign subsidiaries under section 1248 so that petitioners' gains from sale of either domestic corporation's stock should be recognized as dividends, (2) what portion of the consideration received by petitioners is allocable to the stock of the domestic corporations, (3) whether the $ 137,478 reported by petitioners as ordinary income attributable to imputed or unstated interest should have been reported as capital gain, and (4) whether petitioners are liable for additions to tax and increased interest under sections 6653(a)(1) and (2), 6621(c), and 6661. FINDINGS OF FACT The parties entered into stipulations of fact and documents, *427 all of which are incorporated by this reference. Petitioners were at all pertinent times husband and wife, who at the time their petition was filed had their legal residence at Waimanalo, Hawaii. Background
Petitioner Howard Teller (petitioner or Teller) graduated from the University of South Carolina in 1962 with a degree in electrical engineering and thereafter was employed by the General Electric Co. performing advanced product research, where he worked with Antal Csicatka, the inventor of FM stereo radio. He became a manager in the radio engineering department, where he worked as an engineer and supervised 21 engineers. Petitioner went on to work in managerial positions for two other large manufacturers of radios. His experience and expertise included involvement in the renegotiation of contracts for imported electronic audio equipment. After leaving the employ of electronics manufacturers, petitioner worked for Chicago Display Co. (CDC), a direct mail marketing business. One of CDC's activities was to provide radios to American Oil Co. for sale to its credit card customers by means of an advertisement in customers' monthly statements. Petitioner, in addition to *428 advanced technical knowledge of electronics, especially radios, was proficient as a promoter and vendor of radio and electronic products. From 1979 through September 1983, petitioner resided in Taiwan, Formosa, and thereafter resided in Hawaii through the time that the petition was filed in this case. Modular Radio Corp.
Modular Radio Corp. (MRC) was incorporated in the State of Illinois by petitioner on January 13, 1971, for multiple purposes, including designing, fabricating, promoting, marketing, and selling electronic components. From inception until July 1, 1976, Teller owned 100 percent of MRC's stock. MRC did not have separate offices and used the office of Teller's attorney, Robert Zeitner (Zeitner), to maintain its records. MRC was not formed principally for the holding, directly or indirectly, of stock of one or more foreign corporations. Teller's expertise and efforts provided the basis for any success enjoyed by MRC. In addition to Teller, MRC's only employee was John Edwards (Edwards). As of July 1, 1976, Edwards was hired as vice president of MRC and he served as a member of MRC's board of directors. Edwards held 49 percent of MRC's shares and Teller the *429 remaining 51 percent from July 1, 1976, until some time early in 1979 when MRC redeemed Edwards' shares and his relationship with MRC was terminated. At the time of his termination, Edwards sued MRC claiming $ 800,000 in damages. Teller and Edwards settled this litigation. Initially, MRC was engaged primarily in the design of electronic radio products that were assembled in southern Illinois and marketed though CDC to American Oil Co. credit card customers. Petitioner, while performing the contract services for CDC, conceived of an idea to use the National Weather Service Radio broadcasts in an advertising banner or sign at gas stations. While providing promotional advertising for the gas station, the device would provide motorists with up-to-date weather conditions in the vicinity of their travel. In addition, petitioner designed a wall barometer with a built-in weather radio system which could be activated by the push of a button to provide local weather conditions. While working on this project, petitioner decided that the radio circuits sold by Radio Shack (which had been used in petitioner's prototype "talking weather station") did not have the quality of reception he *430 thought necessary for the success of his product. After unsuccessfully working with a Hong Kong company to make a better radio circuit, petitioner designed his own circuit. Petitioner's circuit was incorporated in the talking weather stations which were successfully marketed through American Oil Co., Shell Oil Co., and Sears, Roebuck & Co.
During the mid-1970's MRC was awarded a contract to design five radio products to be manufactured by untrained local labor in Algeria. MRC received in excess of $ 250,000 in income for its part in this venture. From mid-1976 through early 1979, Edwards was hired to provide a presence in the Far East so as to permit Teller to concentrate on expanding the domestic radio business of Teller's corporations. Teller, with respect to contracts of MRC, was instrumental in the design (electronic and cabinetry), quality, quality control, and marketing of its products. For the fiscal years ended 1971 through 1983, MRC's gross receipts, other income, income or loss, and salary paid to Teller were as follows: Fiscal
Gross
Other
Income
Teller's
Year
Receipts
Income
(Loss)
Salary
1971
$ 504
0
$ 38 0
1972
5,008
0
3 0
1973
45,886
0
1,016 0
1974
40,164
0
(1,062)
0
1975
195,161
0
(75,810)
$ 44,000
1976
264,978
$ 1,576
58,966 55,350
1977
168,589
7,689
(15,021)
36,225
1978
169,118
10,682
(44,424) 48,833
1979
186,997
11,337
(84,235)
103,483
1980
259,114
1,147
27,884 113,500
1981
0
3,624
(6,908)
7,500
1982
0
0
(4,186)
0
1983
0
284
(220)
0
*431 On the last day of its fiscal year 1971 through 1983, MRC's balances of cash, total assets, and retained earnings were as follows: Year
Cash
Total Assets
Retained Earnings
1971
$ 940
$ 2,470
0 1972
541
2,746
0 1973
1,867 4,073
0 1974
835
3,116
0 1975
40,779
62,276
($ 75,810)
1976
172,366
243,810
50,256 1977
117,142
347,413
21,738 1978
73,271
177,238
(22,665)
1979
8,486
24,233
(108,350)
1980
6,889
15,719
(579)
1981
179
8,539
5,374 1982
5,035
8,689
1,189 1983
7,257
10,441
2,941 As of the end of its 1983 fiscal year, MRC's balance sheet reflected the following entries: Assets:
Cash
$ 7,257
Investment in wholly
owned subsidiary (Nimbus)
at cost
2,200
Fixed depreciable assets
563
Intangible assets
421
Total assets
10,441
Liabilities:
Loans from stockholders
$ 5,000
Commons stock
2,500
Retained earnings
2,941
Total [sic] liabilities
10,441
Radioresearch Corp.
Teller incorporated Radioresearch Corp. (RRC) under the laws of the State of Illinois on April 28, 1975, for multiple purposes, including the marketing, design, and production of high technology electronic products. From inception *432 through December 28, 1983, Teller was the sole shareholder of RRC and its records were likewise maintained at Zeitner's office. RRC had no employees. Teller had intended to use RRC for marketing purposes, liability protection for MRC and Teller, and provision of services to customers other than those provided by MRC. RRC was not formed principally for the holding, directly or indirectly, of stock of one or more foreign corporations. RRC had no corporate income activity prior to 1980. For its fiscal years ended 1980 through 1983, RRC's gross receipts, income or loss, cash balance, total assets, and retained earnings, were as follows: Fiscal
Gross
Income
Cash
Total
Retained
Year
Receipts
(Loss)
Balance
Assets
Earnings
1980
0
($ 20)
$ 320
$ 10,980
($ 20)
1981
0
(125)
331
10,855
(145)
1982
0
(136)
331
10,719
(281)
1983
0
(136)
331
10,583
(417)
During the period in question, RRC's balance sheet reflected $ 1,000 of capital in the form of common stock. Weather Radio
A weather radio system was initiated in 1953 by a division of the U.S. Department of Commerce. The system progressed from 1 transmitter in New York to approximately 50 in *433 1972. As of the time of trial, there were about 380 weather transmission stations. The broadcast transmission was available to anyone with a special receiver. The first generation receivers were generally expensive ($ 100 to $ 750) and were ineffective for purposes of mass marketing. The Federal Government attempted to promote development of a high-quality, low-cost weather radio for the general public. One of the Federal Government's intended purposes was to establish a wide-based emergency warning network for the general public. Although a large electronics retailer had marketed a relatively low-cost weather radio (which was cube-shaped and could be used on a desk) the quality of this item was low and it was difficult to market. Around 1974, when Teller had devised a better quality and relatively low-cost weather station, he visited Federal Government offices where his product was well received. Thereafter, following up on suggestions from Government officials, Teller developed a weather radio which also had a "siren alert" feature to alert the owner to turn on the weather radio. Although the transmission of weather information may be continual, people may miss emergency *434 weather information if they do not continually listen to the radio. Emergency weather information is preceded by a 10 - to 15 - second 1050 Hz tone. Teller's "siren alert" was triggered by the 1050 Hz tone so that the radio owner would know that a weather alert broadcast was imminent. This alert would prompt the owner's activation of the weather radio. Teller's weather radios were designed to be sold for $ 29.95 without the siren alert and $ 39.95 with the siren alert. Radio Shack -- Circuit and Tuner Patents
Radio Shack, a division of Tandy Corp. (one of the nation's largest retailers of consumer electronics), has sold and continues to sell about 80 to 90 percent of (dedicated) weather radios domestically. Prior to petitioner's involvement, Radio Shack had been purchasing weather radios from another company, but had experienced quality problems, consumer complaints, and product returns. During the mid-1970's MRC, as an American agent, attempted to sell weather radios to Radio Shack for $ 15. Due to Radio Shack's policy not to buy from an American agent products manufactured in the Far East, they would not purchase from MRC. Radio Shack's policy was intended to maintain *435 situs control over the manufacturing process, which could not be accomplished as effectively when purchases were made through domestic sellers of foreign manufactured products. Accordingly, on February 15, 1977, Teller, using MRC as a parent corporation, formed Nimbus (Hong Kong) Ltd. (Nimbus), a Hong Kong trading company, for the purpose of selling weather radios to Radio Shack and others. At all pertinent times, MRC owned all of the outstanding shares of Nimbus stock. Other than the fact that Nimbus was the seller, the price and other terms were the same and Radio Shack agreed to purchase a substantial quantity of the radios. For a period of time Frank Cole (Cole) was employed by Nimbus in the Far East. In his daily activities, Teller did not make distinctions between Nimbus and MRC and he continued to be the major reason for any success enjoyed by MRC or Nimbus. For the fiscal years ended in 1977 through 1983, Nimbus' gross receipts, income or loss, cash balance, total assets, and retained earnings, were, as follows: Fiscal
Gross
Income
Cash
Total
Retained
Year
Receipts
(Loss)
Balance
Assets
Earnings
1977
[1] NA    $ 81,500 NA    NA    NA
1978
$ 716,834
196,659 NA    NA    NA
1979
1,823,440
523,465 $ 358,783 $ 20,445
($ 307,766)
1980
2,564,696
694,254 [2] 969,643 1,524,277
694,255 1981
1,345,980
582,112 [2] 1,628,402 2,151,128
2,147,401 1982
2,169,256
(69,091)
[2] 1,905,704 2,298,204
2,295,829 1983
1,986,457
(481,952)
[2] 1,494,675 1,813,877
1,813,873 *436 Nimbus' balance sheet as of the end of its 1983 fiscal year contained the following entries: Assets:
Cash
$ 1,494,675
Trade notes and accounts receivable
75,448
Prepaid expenses
233,754
Loan
10,000
Total assets
1,813,877
Liabilities:
Common stock
$ 4
Retained earnings
1,813,873
Total [sic] liabilities
1,813,877
On September 19, 1980, Teller, using RRC as a parent corporation, formed Weatheralert, Ltd. (Weatheralert), a Hong Kong trading company. At all pertinent times, RRC owned all of the outstanding shares of Weatheralert stock. For the fiscal years ended in 1980 through 1983, Weatheralert's gross receipts, income or loss, cash balance, total assets, and retained earnings were as follows: Fiscal
Gross
Income
Cash
Total
Retained
Year
Receipts
(Loss)
Balance
Assets
Earnings
1980
$ 1,204
($ 2,566)
$ 130,106
$ 181,472
($ 2,566)
1981
1,378,410
422,936 283,530
555,683
432,195
1982
372,870
(51,479)
334,778
381,718
380,068
1983
74,000
(129,690)
240,378
250,378
241,119
*437 Generally, because of higher profits, Radio Shack prefers to sell products manufactured by its own companies. However, Radio Shack was prevented from producing its own weather radios of equal quality because Teller had certain technological patents. That patented technology included a Latching Detector Circuit, (Circuit Patent) and a Ground-Loop Injection VHF Tuner Patent (Tuner Patent or Tuner). The Circuit Patent and the Tuner Patent were granted on June 12, 1979, and November 30, 1982, respectively. The Circuit Patent enabled the siren alert to activate upon transmission of a weather warning signal by the weather radio transmitters. Although there were other devices that could be used to activate a circuit, Teller's unique use of multivibrators had a proven track record and record of reliability. The Circuit Patent resulted in a consumer rejection rate below that of the relatively high standard required by Radio Shack. The Tuner Patent permitted the reception of three weather radio frequencies using only one, rather than three, crystal and it improved the rejection of unwanted signals in weather radios by approximately 30 times. The Tuner also helped to reduce, by several *438 times, the amount of incidental radiation from weather radios. The effect of reduced radiation was to permit construction of a weather radio with a less expensive case for radiation containment while still conforming to Federal Communications Commission requirements. The Tuner also permitted the use of fewer parts than certain other multiple frequency weather radios using other forms of tuners and eliminated the need for tapped coils. A tapped coil is a coil of wire inside a radio which requires the attachment of another circuit element, which is not necessary if the Tuner is used. The sales of pocket weather radios increased from a range of about 11,000 to 32,000 units before use of the Tuner, to as many as 116,000 after incorporating the Tuner. The Radio Shack pocket weather radio, which sold for $ 12.95, did not sell as well as MRC's pocket weather radio at $ 19.95. Radio Shack personnel attributed the success of MRC's unit to its effectiveness and quality. The crystal control was considered the most important factor and the circuitry (Tuner) was considered a secondary reason for the better quality. Radio Shack did not produce a comparable quality radio because "they did *439 not know how." Changes in Petitioner's Health and Business Circumstances
In the late 1970's, petitioner began suffering from stress-induced severe hypertension. The stress also caused dyshidrosis. Drugs were used to control his condition, but were generally unsuccessful. Petitioner's doctor advised him to reduce his stress or he would be more likely to experience life-threatening events, such as a stroke. In an attempt to alleviate his stress, petitioner relied more on Edwards or Cole to operate Nimbus and Weatheralert in the Far East, but that proved to be unsatisfactory. Finally, and in connection with his stress-related conditions, petitioner listed the business for sale with a broker in 1981. The Sales Transactions
1. Paignton Ltd. and John Walker Haworth
About 1 year into petitioner's attempt to sell the business, John Walker Haworth (Haworth), an unrelated Hong Kong investment banker, expressed an interest in Teller's business activities. Following negotiations between Haworth and petitioner, agreements for the assignment of the Circuit Patent were executed April 16, 1982. The agreements recited that the Circuit Patent would be transferred from Teller *440 to Paignton Ltd. (Paignton) (a Virgin Islands corporation owned by Haworth) for a $ 5 million selling price payable $ 50,000 upon execution, $ 50,000 on April 20, 1982, and $ 100,000 per month for 49 months beginning May 20, 1982, and on the 20th day of each month thereafter. Paignton, by means of an agreement dated April 20, 1982, agreed to transfer rights to the Circuit Patent under a nonexclusive license to Nimbus in exchange for a total of $ 4,976,000, payable $ 311,000 upon execution and every 3 months thereafter until the license was terminated. The stated term of the license was 48 months. Paignton was newly formed and had limited amounts of capital at the time of these agreements. The assignment of the Circuit Patent was not recorded with the U.S. Patent and Trademark Office (PTO). Petitioner received payments totaling $ 1,200,000 from Paignton during 1983. Petitioner reported all but $ 137,478 as capital gains on the installment basis attributable to the sale of a patent. The $ 137,478 was reported as imputed or unstated interest at ordinary income rates. Paignton was "wound-up voluntarily" (dissolved or liquidated) by means of a January 18, 1984, meeting of its directors. *441 2. The Sale to Zinta Trading Ltd.
Teller, on December 28, 1983, executed a $ 3,008,945.47 Buy-Sell Agreement with Zinta Trading Ltd. (Zinta), a Hong Kong corporation, for Teller to transfer: All of the outstanding shares of stock of MRC and RRC, all of Teller's interest in any future payments from the Paignton patent assignment, the Tuner Patent, patents on the exterior of the weather radio, and a trademark related to Nimbus. Teller had originally intended to sell the MRC and RRC stock for cash. Negotiations, however, resulted in the sale of the stock and the intellectual property necessary for the operation of MRC and RRC. The Buy-Sell Agreement between Zinta and Teller was not recorded with the PTO. The negotiations leading up to the drafting of the agreement became stalled when Teller could not decide on a price and the potential buyer insisted that Teller continue in the business after the sale, something Teller was against. A couple of days before Christmas 1983, the buyer's attorney advised from Hong Kong that the deal was off because an agreement could not be reached before yearend. A subsequent communication from Hong Kong revealed that the buyer was willing to *442 continue negotiating. One day after Christmas, Teller's attorney, Zeitner, flew to Hawaii and continued on to Hong Kong with Teller. After an all-night flight, Zeitner was fatigued, but he went to a banker's office and worked all day drafting an agreement. Zeitner prepared and worked on the Buy-Sell Agreement, but he had no specialized legal expertise concerning intellectual property. Zeitner was less concerned about the details of the Zinta transaction because it was a cash transaction and he felt that Teller would be protected so long as he received the consideration on the front end of the transaction. The early drafts of the agreement focused on the buyer's interest in acquiring the business entities. As the discussions and drafting progressed, the buyer became interested in any of Teller's intellectual and other property. Zeitner advised that some of the interests had already been assigned. The buyer insisted on assignment of rights and intellectual property. These matters were added on the early draft which was based on the concept of selling the stock to transfer the entire business operation. Unbeknownst to Zeitner, the name "Zinta" was not being used at the time *443 of the Buy-Sell Agreement, although the buyer's representative requested that the buyer be shown as Zinta. Zinta was the successor to Adagio Ltd. Although the buyers under this agreement spent several months evaluating MRC and RRC, Teller knew little about Zinta and was not even sure who signed the Buy-Sell Agreement on behalf of the buyer. MRC and RRC were both dissolved effective July 1, 1984. At the time of the Zinta Buy-Sell Agreement, Paignton remained obligated to pay $ 2,900,000 under the Circuit Patent Assignment Agreement. At that same time, Nimbus owed $ 2,799,000 to Paignton under the Circuit Patent Licensing Agreement. By means of assignment dated January 15, 1988, the Circuit Patent and the Tuner Patent were assigned to two Liberian companies nunc pro tunc as of December 29, 1983. These assignments were recorded with the PTO, on February 1, 1988. The preamble to the assignments of the patents recited that Teller was the owner of the "entire right, title and interest" in the Circuit Patent. The deeds of assignment reflected that Teller was assigning the patents, rather than Haworth or Paignton. The transaction reflecting the assignment of the Tuner Patent to *444 the Liberian companies complied with the technical formalities for patent transfer, whereas the transaction with Zinta was not as technically correct with respect to the transfer of the patents from Teller. The sale of the Tuner Patent to Zinta was not recorded with the PTO. The documents evidencing the sale of the Tuner Patent to Zinta are more informal than the assignment of the same patent to the two Liberian companies. From their inception through December 28, 1983, Nimbus and Weatheralert were controlled foreign corporations within the meaning of section 957. OPINION Section 1248 -- Meaning of the Term "Principally"
We first consider whether either of two domestic corporations was availed of principally for holding stock of foreign subsidiaries under section 1248 so that petitioner's gains from sale of either domestic corporation's stock would be recognized as dividends. We will also consider what portion, if any, of the consideration received in connection with the sale is allocable to the stock of the domestic corporations. Section 1248 is concerned with the gain from certain sales or exchanges of stock in foreign corporations. It was introduced as part of the *445 1962 Revenue Act, Pub. L. 87-834, 76 Stat. 960, to remedy situations where foreign accumulated income was repatriated by means of a liquidation, sale or exchange, or tax-free reorganization. In those situations any gains were taxed at lower capital gains rates. The congressional objective of section 1248 was to tax foreign accumulated income and to do so at ordinary, as opposed to capital gain, rates. S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 703, 813; H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 480. Section 1248(a) provides for the general rule that gain recognized from the sale or exchange of stock in a foreign corporation shall be included in the seller's gross income as a dividend to the extent of earnings and profits of the foreign corporation attributable to such stock. The seller must have owned "10 percent or more of the total combined voting power of all classes of stock entitled to vote * * * at any time during the 5-year period ending on the date of the sale or exchange when such foreign corporation was a controlled foreign corporation (as defined in section 957)". Section 1248(e) specifically extends *446 the provisions of section 1248(a) to situations where the repatriation is accomplished through the sale of stock of a domestic corporation which was "formed or availed of principally for the holding, directly or indirectly, of stock of one or more foreign corporations". Accordingly, a domestic corporation may fall within the purview of section 1248(e) where it was formed principally for the purpose of holding one or more subsidiaries. The sale may also come within section 1248(e) if the domestic corporation was availed of principally for the proscribed purpose. The parties here agree that the corporations in question were not formed for holding the stock of the foreign corporations. Petitioner argues that his intent should be determined "at the time the event which caused the taxpayer to seek to sell the stock occurred." In other words, petitioner asks us to limit our focus or inquiry to the time that he became motivated to sell the stock. Petitioner relies upon Temkin v. Commissioner, 35 T.C. 906 (1961), [2] in support of his position. That case does not provide support for petitioner's argument, although it concerns a statute with similar language to that *447 of section 1248(e). Temkin concerned section 117(m), Internal Revenue Code of 1939, which caused the taxation, at ordinary rates, of the proceeds of the sale of corporate stock where the corporation was "formed or availed of principally" for a specific proscribed purpose. There it was recognized that the facts may facially reflect that the proscribed purpose could exist, but that a taxpayer was entitled to show the absence of the proscribed purpose. Temkin v. Commissioner, supra at 910-911. That case, although analogous, does not, as a matter of law, limit the point in time when the intent or purpose is determined. We look to all of the facts and circumstances surrounding the sale of the domestic corporate stock to determine if the corporation *448 was principally availed of for the proscribed purpose. The parties here have stipulated that Nimbus and Weatheralert were both controlled foreign corporations and that MRC and RRC were not formed for the purpose of holding Nimbus or Weatheralert. There is also no question that MRC and RRC were, at least to some extent, availed of for purposes of holding the stock of Nimbus and Weatheralert, respectively. Accordingly, the focus of the controversy here is whether either MRC or RRC was availed of principally for section 1248 purposes. Interpretation of the term "principally" within the meaning of section 1248 is an inquiry of first impression. The statute and underlying regulations do not define the term "principally" in the context of section 1248(e). The regulations establish a facts and circumstances test for determining whether or not the domestic corporation was "availed of principally" for the proscribed purpose. See sec. 1.1248-6(c), Income Tax Regs.
While no cases have specifically addressed the meaning to be afforded to the term "principally" within the context of section 1248, that term has been defined in other contexts. The phrase "principal purpose" is used *449 in section 269 and explained in section 1.269-3(a), Income Tax Regs., as being a purpose that exceeds, in importance, any other purpose. Additionally, the Supreme Court has defined the term "primarily" in connection with section 1221 as "principally" or "of first importance". Malat v. Riddell, 383 U.S. 569 (1966). Although the term "principally" is used in Malat v. Riddell, supra, in a manner that is correlative or reciprocal to its use in section 1248, it may be considered as an equivalency in this setting. On numerous occasions we have interpreted statutory language by reference to the meaning of a word in its ordinary everyday sense. [3] We accord the everyday meaning to the term "principally" as being of first importance. *450 One may reasonably deduce from other usages of the term "principal" that it is not equivalent to the term "substantial". [4] The parties here do not dwell upon the quantitative aspects of the term "principally", but each urges that a different purpose was the principal one. Petitioner argues that the principal purpose of MRC and RRC was to secure business, and that his purpose was not achieved because of petitioner's poor health and inability to obtain competent help with his Far East operations. Respondent argues that MRC and RRC were availed of principally to hold the stock of Nimbus and Weatheralert.
The Positions of the Parties
Respondent has advanced a number of facts that she believes support her argument and petitioner has advanced a different factual scenario which he believes negates respondent's arguments. *451 Respondent argues that MRC[5] was principally availed of to hold Nimbus stock because MRC was otherwise a "superfluous entity". Respondent also alleges and argues that certain of the intermediary entities involved in the questioned transaction were shams created solely to assist petitioner in avoiding the imposition of U.S. taxation on his patents and business activities. [6] Petitioner argues that respondent misunderstands the transaction in question. *452 Respondent cites five factors in support of her argument, as follows: (1) MRC's profile, (2) a comparison of MRC's financial status and activities with those of Nimbus, (3) Teller's all-encompassing role with MRC, (4) Teller's residence in the Far East, and (5) dissolution of MRC soon after the Buy-Sell Agreement was executed. Respondent also contends that numerous inconsistencies in the facts reflect petitioner's true motives in this series of transactions (respondent's "sham argument"). Respondent points out that, for the 3 years preceding the sale of MRC's stock, it had no gross receipts or business activity. Respondent describes MRC as a "shell" which had as its only purpose the holding of Nimbus' stock. Additionally, MRC did not have a separate corporate office and substantially all of its business potential had been transferred to Nimbus. A comparison of MRC's and Nimbus' gross receipts, income, assets, cash, and retained earnings also reflects that the business activity had been diverted from MRC to Nimbus and that MRC had lost its potential as a business entity by 1980. Respondent admits that MRC was a viable business entity prior to that time, but argues that its continued *453 existence after that time was solely to facilitate tax savings or benefits for Teller. Respondent also points out that MRC was Teller's alter ego and that MRC had little potential without Teller. In this connection it is pointed out that from 1979 forward Teller was not a resident of Chicago, Illinois (MRC's registered location and where Teller's attorney's office including MRC's records were located). Teller's residence was in Taiwan until 1983 when he moved to Hawaii. Finally, respondent emphasizes that the new owner of MRC dissolved it relatively soon after the culmination of the Buy-Sell Agreement, reflecting that it had no business purpose or "economic justification", other than Teller's use of it to hold the stock of Nimbus. As to the sham aspect, respondent, relying on several inconsistencies in the record, characterizes the situation as one in which petitioner has attempted to avoid the effect of sections, or groups of sections, including 1248(a) and 1235(a), 1235(d), and 267(b) and 1249. [7] The following inconsistencies are advanced by respondent in support of her argument: (1) The name Zinta was in the Buy-Sell Agreement, but did not become registered in Hong Kong until *454 several years later; (2) the patents which were the subject of assignment to Paignton were eventually retroactively assigned to Liberian companies; (3) the Paignton patent assignment was not recorded in the PTO, whereas under the Liberian assignment the patent assignments were recorded; (4) Teller entered into a $ 5 million transaction with Paignton even though Paignton had only $ 2 in capital and was only 3 weeks old. Petitioner argues that respondent has ignored his uncontradicted testimony that it was his intention to concentrate on domestic radio design while other individuals were to be responsible for Nimbus and Weatheralert. Petitioner indicates that he first attempted to sell MRC and RRC when they were more active. He then points out that attempts to obtain competent or acceptable employees to operate the Far East companies were unsuccessful. Petitioner also contends that his failing health was another reason for the inactivity of MRC and RRC. Petitioner agrees that MRC and RRC had little or no revenue in the years preceding the subject transaction, but inactivity in the period prior to sale does not lead "to an unrebuttable conclusion that section 1248(e) applies; *455 imposing a mathematical, bright-line test." Petitioner believes that his inability to find competent employees for the Far East activities and his poor health were sufficient reasons for the inactivity and to show that the proscribed purpose of section 1248(e) was not the principal purpose. Addressing respondent's alter ego argument, petitioner believes that his significant role in the success of MRC and RRC supports his position and not that of respondent. Petitioner points out that his choices were limited because of his role in the success of the domestic companies. When he was required for business reasons to sell to Radio Shack through *456 companies in the Far East, petitioner chose to direct his energies to the then-profitable entities in the Far East. Petitioner contends that those circumstances do not automatically subject petitioner's domestic corporations to the provisions of section 1248. Petitioner then contends that Zinta's liquidation of MRC and RRC after the sale is irrelevant because the buyer's intent should not be measure of the applicability of section 1248. Finally, addressing respondent's sham argument, petitioner contends that, assuming petitioner structured the transaction as argued by respondent, a taxpayer is entitled to structure his transactions to result in the lowest income tax possible and attempts to do so should not cause section 1248(e) to apply. Analysis
In applying a facts and circumstances test in this case, we again emphasize that petitioner must show that the holding of the foreign stock was not the principal purpose of either MRC or RRC. There is no question that the domestic corporations were availed of to hold the stock of the foreign corporations. Respondent agrees with petitioners that the domestic corporations were not formed for the proscribed purpose and that up *457 until 1980, the domestic corporations were not principally availed of to hold the stock of the foreign corporations. Respondent places great emphasis upon the financial results and conditions of petitioner's various corporations. Although passive or nominal business activity is not conclusive evidence showing that a domestic corporation was principally availed of to hold stock of a foreign corporation, it is probative evidence and adds to petitioner's burden. There is a clear pattern of diminishing business activity for MRC and relatively little business activity for RRC. MRC had experienced moderate success from the mid-seventies through the time that Nimbus was formed to comply with the policies of Radio Shack. MRC's gross receipts went from about $ 40,000 in the early 1970's to $ 259,114 for 1980, the year before MRC's gross receipt ceased, whereas Nimbus' aggregated gross receipts were $ 716,834 for 1978 (the year after its formation) and then its gross receipts ranged between $ 1,345,980 and $ 2,564,696 for the years 1979 through 1983. The assets, including cash, and retained earnings of MRC and Nimbus also had an inversely proportionate relationship; i.e., as MRC's balances *458 decreased, Nimbus' increased. Accordingly, Teller's and/or MRC's success was more moderate until the time of Radio Shack's involvement with petitioner resulting in gross receipts 10 times those of MRC's best year. Although MRC had experienced in excess of $ 250,000 from consulting in Algeria during the mid-to-late 1970's, that was MRC's only significant source of income other than the sale of weather radio and other related electronics. RRC had no business gross receipts or business activity in any of the years 1980 through 1983. Although Teller may have had plans for development of RRC and for further development of MRC, those plans are not reflected in the record and cannot be found to be a principal purpose for either corporation. Petitioner's progressively worsening illness is a factor which could be argued for either party's position. Although it is correct that petitioner was more limited in his ability to keep MRC or RRC operationally productive after 1979, that condition was not improving, and yet petitioner failed to change the circumstances -- the continued accumulation of unrepatriated income from the sales of electronic equipment in the Orient. Those same sales *459 would have been received by MRC but for Radio Shack's requirement of purchasing from Far Eastern entities. With respect to petitioner's argument that he was unable to find competent employees to permit petitioner to spend more time and focus upon MRC or RRC, the same reversible reasoning would apply. Finally, petitioner argues that when he began the process of attempting to sell the corporate entities, MRC's business activity and asset pictures would have constituted the principal purpose. As discussed above, the term "availed of" is not limited to a particular instant or period and it is not necessary for the domestic corporation to have been formed for the proscribed purpose. We believe that an analysis of all facts and circumstances is required from their formation through the time in which the foreign subsidiaries were formed. Accordingly, we have considered the Paignton and Zinta transaction and all other related factors. The sale of electronic products to Radio Shack was the center of gravity for Teller and all of his related corporate or business entities. Although a limited number of other ventures or activities were attempted, these other activities were insignificant *460 and did not result in any measure of success relative to the weather radios. Teller, a talented innovator and businessman, used the domestic entities as his alter ego, and the formation of the foreign subsidiaries was merely a further extension of Mr. Teller's business enterprise. We find the circumstances of this case to be squarely within the intended purpose of section 1248 to cause ordinary income taxation of repatriated and domestically untaxed foreign earned income. We accordingly hold that MRC and RRC were both availed of principally to hold the stock of Nimbus and Weatheralert, respectively, and that the gain from the sale of the stock should be taxed at ordinary income rates. [8]
*461 On brief petitioner argued that he is entitled to use tax planning to pay the least tax legally permissible. We generally do not disagree with that statement. We must point out, however, that Congress has legislatively attempted to tax,as ordinary income, unrepatriated foreign-source income. Petitioner is not entitled to avoid that result under the facts of this case. Having found that section 1248 is applicable, we must now consider whether a portion of the sales proceeds is attributable to assets other than the stock of MRC and RRC. Whether the Sales Proceeds Are Solely Attributable to the Stock of MRC or RRC
Respondent contends that all of the sales proceeds should be attributed solely to the stock of the domestic corporations. Respondent's argument is based on her reading of the Buy-Sell Agreement. Petitioner argues that respondent had stipulated that various assets, including the Tuner Patent and right to the payments under the Paignton assignment, were sold by petitioner in addition to the stock of the MRC and RRC. Petitioner also counters that respondent has incorrectly interpreted the agreement and that it provides for the sale of a package of assets, for which *462 the sale price must be allocated. We are surprised by respondent's argument that only the stock of MRC and RRC was sold in exchange for the $ 3,008,945.47 from Zinta. The parties stipulated that: a sale agreement was reached between Teller and * * * [Zinta] whereby Zinta purchased from Teller: a) all of the outstanding stock of MRC and RRC; b) all of Teller's interest to any future payments under the Patent Assignment Agreement with Paington [sic]; c) all of Teller's interest in Patent No. 4,361,910 (the Ground Loop Injection VHF Tuner Patent); d) all of Teller's interest in U.S. Patent Des. Nos. 242078, * * * 253948 * * * (each of which related to the exterior design of weather radio enclosures); and e) U.S. Trademark Registration No. 1093124 (relating to the name "Nimbus"). The total consideration paid by Zinta to Teller for said assets was $ 3,008,945.47. * * * The stipulation continued with a reference to and attachment of the Buy-Sell Agreement. Although the parties' stipulation of facts contains the prefatory condition that "The truth of assertions within stipulated exhibits is not necessarily agreed to and may be rebutted or corroborated by additional evidence", *463 no conditions or limitations were placed upon the stipulated facts, composed in paragraphs and agreed to by the parties. Respondent, in spite of her agreement to the above-quoted stipulation, argues that the Buy-Sell Agreement reflects an intent to sell stock only and that petitioner should be subject to a "strong proof" requirement [9] because petitioner is arguing for a result different from his agreement with Zinta. Although we would normally hold the parties to their agreed stipulation in this type of situation, where other stipulated facts or facts presented at trial appear contrary, we have the discretion to find facts in conflict with the stipulation. See Jasionowski v. Commissioner, 66 T.C. 312, 318 (1976). See also Mead's Bakery, Inc. v. Commissioner, 364 F.2d 101 (5th Cir. 1966), affg. T.C. Memo. 1964-104. Accordingly, we must consider any discrepancies between the different portions of the record and determine whether it would be appropriate to disregard the parties' stipulation. [10] In this process, we note that the parol evidence rule would not be applicable as between petitioner and respondent concerning their *464 factual stipulation agreement. See Smith v. Commissioner, 324 F.2d 725 (9th Cir. 1963), affg. T.C. Memo. 1962-128. *465 Concerning the Buy-Sell Agreement, we observe that it is eight pages long and broken into 23 paragraphs. Only 4 of the 23 paragraphs are subdivided into subparagraphs and each paragraph is composed of a single sentence. The wording is simple and concise. The first 12 paragraphs contain statements of fact and Teller's warranties concerning the domestic corporations, their foreign subsidiaries, and the stock ownership. The 13th paragraph contains a recitation of the cash selling price, without designating which assets or items were being purchased. The 14th paragraph requires Teller to deliver or cause to be delivered various items at the closing, including stock certificates, corporate seals, various patents (including the Tuner Patent), and various records. Paragraphs 15 through 23 contain various post-closing terms, including Teller's role in the Buyer's business with Radio Shack, that Illinois law is applicable, and various notice, warranty, and housekeeping provisions. Paragraph 8, however, contains the recitation that "[The] Seller shall sell and the Buyer shall buy all of the issued and outstanding shares of MRC and RRC for the sum of US$ 3,008,945.47 payable no later *466 than closing, as stated herein." Accordingly, there is an ambiguity in the agreement because Teller owned the patents separately from MRC and RRC. Paragraph 13 provides for the price and paragraph 14 provides for the transfer of numerous items including the stock and patents. Paragraph 8, on the other hand, seems to limit the sale of the shares of MRC and RRC. Respondent makes several points about the Buy-Sell Agreement. Her first argument is an attempt to draw an equivalence between the number of paragraphs and the significance or value of the items referenced. Under this approach, respondent points out that the Tuner Patent is referenced in only one subparagraph, whereas the verbiage concerning corporations and stock consumes a substantial portion of the agreement document. Respondent reasons that "Surely, if the Tuner Patent was as valuable as it is claimed to be and the parties did intend to transfer it as an asset of significant value for consideration, it would have merited a more prominent reference in the operative paragraph 8 of the agreement." On this point petitioner counters that he has sold a group of assets for a lump sum and allocation of the proceeds of sale *467 is appropriate under these circumstances. We do not agree with respondent's reasoning on this point. The sale of a business entity, corporate or otherwise, would more likely require more verbiage than the sale of a perfected patent. Regarding a business entity, there could be concerns about ownership, records, operating assets, and other matters which could require specific description of the status and warranties as to past performance and the condition of the entity up until and at the closing of the transaction. Regarding a perfected patent, the essence of the asset is refined, cataloged, and identified by a number. In the same manner as a real property legal description, the patent number and words of conveyance may be all that is necessary to effectively transfer right or title to a patent. Accordingly, we are unable to draw the same inferences as respondent concerning any quantitative test to resolve this controversy. Respondent's second point is that petitioner should not be permitted to offer evidence to show a variance from the language of the agreement.[11] Respondent refers to a line of cases involving whether there should be allocation of sales price and the amount *468 attributable to covenants not to compete as part of the sale of a business. In the setting of those cases, no allocation had been made in the written agreement of sale and the question considered was whether petitioner should be allowed to "establish a position at variance to the language of the agreement." Peterson Machine Tool, Inc. v. Commissioner, 79 T.C. 72, 81 (1982). In those instances, courts have required the taxpayers to bear the "burden of 'strong proof' since * * * [they are] expressly attempting to alter the terms of the written contract by assigning a value to the covenants not to compete where none had been provided in the agreement." Peterson Machine Tool, Inc. v. Commissioner, supra at 81-82. *469 The situation here is not the type considered in the covenant not to compete cases. Here we consider an agreement which contains an ambiguity between three paragraphs. Strangely, neither party attempted to interpret the agreement under the laws of the State of Illinois, even though paragraph 18 of the agreement contained that requirement. Under the law of the State of Illinois, the intentions of the parties control where the language employed in an agreement is ambiguous. See Village of North Riverside v. Brookfield-North Riverside Water Commission, 15 Ill. App. 3d 752, 305 N.E.2d 221, 222 (1973). We find that the Buy-Sell Agreement is ambiguous as to whether petitioner sold only the stock or the stock, various patents, and other miscellaneous assets. Having found an ambiguity, we consider the evidence in the record which may reflect the intentions of the parties to the Buy-Sell Agreement. Petitioner first attempted to sell the businesses by a sale of the stock, but the final deal was one where the intangibles were also transferred. Petitioner and his attorney, Zeitner, were summoned to Hong Kong on short notice and after a fatiguing all-night *470 flight, became involved in the final negotiation and drafting of the Buy-Sell Agreement. When the first draft was prepared, the Zinta representatives believed that they would be acquiring the entire weather radio business by acquiring the stock of MRC and RRC. After further negotiations, it became apparent that Zinta would also have to acquire the Tuner Patent and the rights to the Paignton agreement in order to operate the weather radio business. The final agreement therefore resulted in the ambiguity. Although the agreement appears internally inconsistent, the surrounding circumstances and sequence of events leave us with an unartful document, but one in which the buyer and seller attempted to exchange both stock and other assets. Respondent, in addition to the ambiguous language, refers us to various idiosyncrasies surrounding the transaction (these were part of respondent's sham argument). Respondent asks us to consider the informality of various aspects of the transaction, the lack of the recording of the Buy-Sell Agreement, the inability to read the name of the seller, and the fact that although the name "Zinta" was used in the agreement, it was not formally in existence *471 until several years later. We give little weight to the informality in and surrounding this agreement because petitioner received over $ 3 million in cash from someone and reported it on his income tax return. The entire focus of this proceeding is to decide whether the proceeds of the sale are to be taxed as ordinary income or capital gains, not to determine if there was in fact a real buyer. The informality does not cause us to find here that petitioner orchestrated this agreement merely for purposes of later convincing respondent or a court that the patents were sold. Although we could find that petitioner has done a poor job in such orchestration, we do not disregard the terms or substance of the agreements under consideration. Respondent also argues that if the Tuner Patent had been assigned here, it would have been recorded to protect the licensed use of the patent. Petitioner counters that any such recording would not be of interest to him because he received cash and was not dependent upon the future success of the buyer. Although the failure to record the assignment of the patent may not affect our basic interpretation of whether assets or rights other than the stock *472 were sold under the agreement, that factor may be probative regarding our eventual consideration of the value to be assigned to the patent. In addition, respondent points out that Teller's right in the Tuner Patent was transferred to Liberian companies 1 day after the December 28, 1983, sale to Zinta. This transfer, however, occurred on February 1, 1988, and was designated as nunc pro tunc as of December 29, 1983. Although we find this somewhat irregular, nevertheless, the fact remains that Teller agreed to and did effect a sale of MRC, RRC, the Tuner Patent, and other assets on December 28, 1983, and received $ 3,008,945.47 in return. According to Zeitner, petitioner's lawyer, the later nunc pro tunc transfers were executed at the request of the same parties in order to properly perfect their patents, which were thereafter filed with the appropriate patent office. Respondent places heavy emphasis on the fact that the transfers were subsequently to Liberian companies, rather than Zinta. We do not find this factor particularly persuasive. The owner of the patents may have had various reasons for the eventual transfer of the patents to Liberian companies or the Liberian companies *473 may have belonged to the owner(s) of Zinta. However, those reasons are irrelevant to this proceeding because the transfers, even though nunc pro tunc back to 1 day after the sale in question were, in the final analysis, after the sale in question. After careful review of the various factors advanced by respondent, we hold the parties to their stipulation. We accordingly find that the evidence in this record reflects that the parties to the agreement intended to buy and sell the stock of MRC and RRC and the various other items listed, including the Tuner Patent, in paragraph 14 of the Buy-Sell Agreement as stipulated by the parties. The Amount Allocable to the Various Assets
Having decided that various assets in addition to the MRC and RRC stock were sold, we must now consider the amount to be allocated to each item. Petitioner argues that $ 238,406 of the $ 3,008,945.47 purchase price received from Zinta is allocable to the shares of MRC and RRC, as follows: MRC -- $ 64,582, and RRC -- $ 173,824. Petitioner asserts that the remainder would be attributable to payments from the patent assignment agreements and to petitioner's interest in the Tuner Patent. In this regard, *474 petitioner bases his allocation on a proportionate division based on the appraisal offered by petitioner's expert who placed a $ 4,344,202 aggregate value on the various items, as follows: MRC stock
$93,241
RRC stock
250,961
Payment from patent assignment
2,200,000
Teller's interest in Tuner Patent
1,800,000
Total value
4,344,202
Petitioner suggests that the sale was for less than market value because he was forced to sell due to poor health. Respondent argues that the amount or value allocable to MRC and RRC stock is not less than $ 1,950,000. Respondent relies on her expert whose report contains data used to arrive at the following amounts: Cash consideration from Zinta
$ 3,008,945
Less: Discount for present value of
stream of payments from Paignton
33,000
Total economic consideration
2,975,945
Less: Value of MRC stock
$ 1,700,000
Value of RRC stock
250,000
Value of Tuner Patent
613,000
Total reductions
2,563,000
Difference allocated to two design
patents and miscellaneous
assets
412,945
The parties are at opposite ends of the spectrum as to values to be assigned to various assets. Petitioner contends that the *475 composite value of the domestic corporations' stock was $ 238,406 and respondent contends that the composite value was $ 1,950,000. It is within this frame of reference that we decide the value of the stock and the other assets. Due to our decision that section 1248 is applicable, any profit on the stock may be taxed at ordinary income rates and profit on the other assets may be taxable as capital gains. Value of the Stock of MRC and RRC
Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973). Respondent's argument is essentially that the value of the MRC and RRC stock could not have been less than the cash balances held by the wholly owned foreign subsidiaries Nimbus and Weatheralert, respectively. In this regard, at the close of their 1983 fiscal years Nimbus' assets totaled about $ 1,800,000 of which about $ 1,500,000 was cash, and Weatheralert's assets totaled about $ 250,000 of which about $ 240,000 was cash. Petitioner argues *476 that the value of Nimbus was substantially less because of its obligation to pay Paignton $ 311,000 per quarter which translates into a $ 2,167,000 discounted obligation. Respondent counters that we should not reduce the value of Nimbus by any obligation to Paignton because the obligation to Paignton was a sham and/or that it was circuitous because of an offsetting amount due to Teller from Paignton. Respondent's argument is based upon the following factors: (1) The transaction with Paignton took place about 1-2/3 years prior to the Zinta transaction; (2) Teller sold his Circuit Patent to Paignton for $ 5 million, payable $ 100,000 per month; (3) at about the same time, Paignton granted a nonexclusive license to Nimbus in exchange for 16 quarterly payments of $ 311,000 or a total of $ 4,976,000; (4) Paignton had been incorporated with $ 2 paid-in capital only 17 days before the transaction; (5) after the Zinta transaction (December 28, 1983) Paignton voluntarily went out of existence on January 18, 1984; and (6) Teller retroactively assigned the Circuit Patent (the subject of the transaction with Paignton) to a Liberian company in 1988, effective December 29, 1983. Based upon these *477 factors respondent argues that we should not reduce the value of Nimbus. Petitioner counters that: (1) Teller was unrelated to Paignton and the transaction was genuine, (2) the license agreement between Paignton and Nimbus was nonexclusive and the patent had a life 10 years longer than the license agreement, and (3) the stipulation of facts contains the statement that the Circuit Patent was assigned to Paignton. We consider here, in the form of the Zinta transaction, Teller's disengagement from the weather radio business, corporations, and related patents and technology. [12] We are cognizant that Teller was the reason for the success of these corporations and that they were used as his alter egos. When he sold out, the buyer had to acquire the entire package of rights and entities to continue the weather radio business. In that setting, we must consider the interrelationships of all aspects of these entities to properly understand the effect of the Zinta transaction upon Teller. Although we do not find the Paignton assignment to be a sham or devoid of substance, the relatively equal amount of the sale price and lease, and the ability of petitioner to mysteriously transfer the *478 patent in question after having allegedly sold it to Paignton, renders Nimbus' obligation to Paignton somewhat illusory. Petitioner did not provide an adequate explanation regarding Teller's ability in 1988 to retroactively transfer the patents, including the Circuit Patent, as of December 29, 1983, if Teller had irrevocably assigned that patent to Paignton during 1982. Additionally, like respondent, we are also suspicious of the agreement with Paignton. We recognize that petitioner was accumulating domestically untaxed and unrepatriated *479 earnings in Nimbus. Moreover, Nimbus' sales receipts were relatively large without any deductions. The Paignton transaction could well have been structured to provide deductions for Nimbus' accumulating business income and to convert these amounts into payouts to petitioner which would be taxable as capital gain upon sale of a patent, rather than ordinary income upon repatriation. In exchange for this benefit to petitioner, Paignton (or Haworth) was to receive the residuary value, if any, of the Circuit Patent. In this connection the amounts to be paid by Nimbus and Paignton were relatively equal. We have considered the record here and the assistance provided by the experts for each party and conclude that the stock of MRC and RRC had a combined value of $ 1,950,000 at the time of the sale to Zinta. To the extent that any part of the $ 1,950,000 is gain, it is taxable as ordinary income. The remaining value is attributable to the various patents and other rights which Teller may have had at the time of the sale to Zinta. We note that the contradictions and confusions between the various agreements and documents in this record make it difficult, at best, to discern which patent *480 or rights Teller had retained as of the time of the sale to Zinta. The parties have not argued that any particular nonstock asset would not produce capital gains instead of ordinary income and accordingly we find it unnecessary to distinguish or allocate the remainder of the proceeds received amongst the various patents and assets transferred to Zinta. In any event, we are not convinced that the Tuner Patent had a value in excess of the difference between the value we have arrived at for the MRC and RRC stock and the sales price. Whether the $ 137,478 Reported by Petitioner as Ordinary Income Attributable to Imputed Interest Should Have Been Reported as Capital Gain
Petitioner reported $ 137,478 of the $ 1,200,000 received from Paignton during 1983 as unstated interest under section 483(a). That interest was reported at ordinary income rates, whereas the remainder was reported at capital gains rates as attributable to the sale of a patent under section 1235. Petitioner argues that for the 1983 taxable year section 483(f)(4) [13] made section 483 inapplicable to a transfer of a patent under section 1235(a). Accordingly, petitioner points out that he erroneously reported *481 the $ 137,478 as interest income taxable at ordinary income rates and should have reported it as proceeds from the patent sale taxable at capital gains rates. Respondent argues that section 267(b) is applicable and that section 1235(d) would apply to make section 1235(a) inapplicable. Here respondent relies upon her contention that the Paignton transaction was a sham. We do not agree that the Paignton transaction was a sham and accordingly do not have to further analyze respondent's argument. We note, however, even if respondent's sham argument had been upheld, we fail to see how section 267(b) would have come into play. Moreover, respondent's sham argument does not square with petitioner's reporting $ 1,200,000 as income from the sale of the patent. Respondent has not determined that such income should not be recognized. *482 Respondent also used the sham argument in an attempt to justify raising a new issue by moving to conform the pleadings to the proof, claiming that the entire $ 1,200,000 is taxable as ordinary income. In this connection respondent sought increased deficiencies. As explained above, that approach must also fail. We hold that petitioners incorrectly reported $ 137,478 as ordinary income and that said amount should have been reported as capital gain. Additions to Tax
Section 6653(a)(1) provides for a 5-percent addition to tax if any part of the underpayment is due to negligence or intentional disregard of the rules or regulations. If section 6653(a)(1) is applicable for the 1983 taxable year, then section 6653(a)(2) provides for a further addition equal to 50 percent of the interest attributable to that portion of the underpayment resulting from negligence or intentional disregard of the rules or regulations. Negligence is defined as lack of due care or failure to do what a reasonable and prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947-948 (1985). Petitioners bear the burden of proof on this issue. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). *483 Respondent argues that petitioners are liable because the factual situation here reflects an obvious application of section 1248, a section which respondent argues is "clear on the subject." We would agree with respondent on this point if we had completely agreed with respondent on all other controversies in this case,including the sham contention. Instead, we note that petitioner reported this transaction without any controversy over the amount. The controversy, instead, concerns whether certain of the items reported should have been taxed at ordinary income or capital gains rates. To decide that question, we had to first interpret the standard of section 1248(e), i.e., the meaning of "availed of principally", a phrase which had not been considered in the context of section 1248 by any court prior to this opinion. Once we decided that threshold issue, we were then required to decide what portion of the sale price was received in exchange for the stock as opposed to the patents and other assets. Petitioner reported these transactions in a manner that was reasonable under the circumstances. In addition, we note that petitioner's actions also resulted in unnecessarily reporting *484 interest income at unfavorable rates. Accordingly, we hold that petitioner has carried his burden of showing that respondent's section 6653(a)(1) and (2) determination was in error. Respondent also determined that petitioners were liable for an addition to tax under section 6661 for a substantial understatement of tax. Section 6661 provides for a 25-percent addition if the substantial understatement is greater than 10 percent of the tax required to be shown on the return, or $ 5,000. Sec. 6661(b)(1). In the absence of a tax shelter, section 6661(b)(2)(B) provides for the reduction of the understatement if: (1) The taxpayer's position is supported by substantial authority, or (2) the taxpayer had adequately disclosed all the relevant facts pertaining to the item which caused the understatement. We quickly dispense with the adequate disclosure aspect because petitioner's reporting the MRC and RRC stock sale merely reflected the name of the corporation, proceeds of sale, basis, and gain. There was no indication that either corporation had ownership in foreign entities. Such information, without more, was insufficient to enable respondent to identify the potential controversy *485 involved here; that is, whether petitioners were subject to the provision of section 1248. Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987). Additionally, the transaction in question was not one of the categories set forth in Rev. Proc. 83-21, 1983-1 C.B. 680, for which additional disclosure of fact is unnecessary. See sec. 1.6661-4(c), Income Tax Regs.
The issue of whether there was substantial authority for the position taken by petitioners presents a more difficult question. Petitioners were partly successful in showing that the gain was taxable as capital gain rather than ordinary income. On this record we find that petitioners had substantial authority for their position even though they were in part unsuccessful. Accordingly, we hold that petitioners are not liable for an addition to tax under section 6661. Increased Interest
Respondent also determined that petitioners are liable for increased interest under section 6621(c). Under that section as effective for the 1983 taxable year, substantial underpayments attributable to tax motivated transactions are subject to 120 percent of the applicable rate of interest *486 under section 6601. "Substantial underpayment attributable to tax motivated transactions" means any underpayment of tax that exceeds $ 1,000 which is attributable to one or more of the transactions enumerated in section 6621(c)(3). Respondent's argument regarding this issue rests upon her contention that the transactions in question were fraudulent or shams within the meaning of section 6621(c)(3)(v). Because we are unable to reach the conclusion that the Zinta and/or related transactions were shams, respondent's argument must fail. In all other respects, we hold that the transactions here were not tax-motivated transactions within the meaning of section 6621(c). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code in effect for the 1983 taxable year. All Rule references are to this Court's Rules of Practice and Procedure, unless otherwise indicated.↩
1. NA indicates that amounts are not available. ↩
2. These cash balances include time deposits.↩
2. See also Burge v. Commissioner, 253 F.2d 765 (4th Cir. 1958), affg. 28 T.C. 246 (1957); Sidney v. Commissioner, 273 F.2d 928 (2d Cir. 1960), affg. 30 T.C. 1155↩ (1958).
3. See, e.g., Cottle v. Commissioner, 89 T.C. 467, 486 (1987) (commonsense meaning of "primarily" under sec. 1231(b)(1)(B)); Finoli v. Commissioner, 86 T.C. 697, 722 (1986) (citing Malat v. Riddell, 383 U.S. 569 (1966), determination of whether an activity was engaged in primarily for profit under sec. 183 and "primarily" was given its everyday meaning of "principally" or "of first importance"); S & B Realty Co. v. Commissioner, 54 T.C. 863, 870 (1970) (interpreting the word "threat" under sec. 1033(a)); Jefferson v. Commissioner, 50 T.C. 963, 968 (1968) (transactions entered into "primarily" for profit under sec. 165). The Ninth Circuit has also interpreted statutory language in accord with its everyday meaning. Pacific Basin Mfg. & Trade Co. v. Commissioner, 716 F.2d 638, 640 (9th Cir. 1983) (provisions of sec. 931(b) construed so as to give "received" its common, everyday meaning); Ricards v. United States, 683 F.2d 1219, 1223↩ (9th Cir. 1981) ("transaction" as used in sec. 2056 interpreted in accord with its ordinary, commonsense meaning).
4. For example, "substantially all" within the context of sec. 521 has been determined to be 85 percent. See Farmers Cooperative Co. v. Commissioner, 89 T.C. 682, 683-685↩ (1987).
5. Our discussion refers to MRC but also embraces RRC because of the similarities in respondent's arguments and the underlying facts. Although respondent's brief separated her arguments concerning MRC and RRC, the reasons and facts in support of her arguments were substantially the same. Respondent pointed out that the facts surrounding RRC present a weaker case for petitioners because: RRC never had any employees, it had only a token office, it had little or no corporate business activity before or after 1980, and never had more than $ 331 in cash. In all other respects, respondent argues that petitioners' position for RRC is similar or factually weaker than for MRC. ↩
6. We do not consider or treat respondent's "sham argument" separately because respondent has advanced that argument only in a factual context in support of her position that sec. 1248(a) is applicable because of sec. 1248(e)↩. Respondent has not argued that the entire transaction should be disregarded or treated differently because of any other provision of the Internal Revenue Code.
7. Respondent points out that sale of the patents from MRC or RRC to Nimbus or WeatherAlert would not have been entitled to capital gains treatment under sec. 1235(a) because of sec. 1235(d) and the definition of "related" person in sec. 267(b). Alternatively, respondent points out that sale of the patents from the domestic to foreign companies may also be subject to sec. 1249.↩
8. We did not separately analyze or rely on respondent's sham argument or approach because it is clear from the facts of this case that petitioner should not prevail on the "principally availed of issue" without considering whether there was a sham involved in these transactions. Moreover, we did not address petitioner's argument that he is entitled to structure his tax transactions to pay the least amount of tax because that argument flies in the face of the purpose or intent for the enactment of sec. 1248↩.
9. Respondent refers to Peterson Machine Tool, Inc. v. Commissioner, 79 T.C. 72, 81 (1982), for a statement of this principle, as follows: This Court has long held that where a taxpayer has entered into an agreement that includes specific terms, the tax consequences of which are in issue, "strong proof" must be adduced by the taxpayer seeking to establish a position at variance to the language of the agreement. * * * See also Commissioner v. Danielson, 378 F.2d 771↩ (3d Cir. 1967).
10. We engage in this process with some trepidation and concern. The stipulation process is a significant and effective part of the litigation process in our Court. It is intended to obviate the need for cumbersome and unnecessary discovery and to assist the parties and the Court to an orderly trial with a full and fair exposition of the facts. On one hand, we expect the parties to stand by their stipulation agreements, but on the other hand it is also important not to permit the stipulation process to become a mine field or trap for the unwary in which the outcome of their case is unwittingly placed in jeopardy. We also recognize that we must engage in this inquiry as to a conflict between stipulated facts and other facts in the record because it is our duty and obligation to find the truth. On balance however, it is less likely that we will disregard the parties' agreed stipulations of fact unless there is a strong compulsion to do so.↩
11. It is most curious that respondent should raise this possible limitation as to petitioner in a context where respondent is trying to show that her stipulation was incorrect or in error by means of evidence without the four corners of the stipulation agreement.↩
12. Additionally, we have considered respondent's observation that electronic technology has a relatively short duration because of the rapid rate of innovation that has been experienced. That observation would tend to temper petitioners' argument concerning the value of the patent remaining in Paignton after the 4-year license to Nimbus expired. Because obligations under the Paignton assignment are found to be illusory, it is unnecessary to further consider respondent's observation.↩
13. For 1983 sec. 483(f)(4) provided: (4) SALES OR EXCHANGES OF PATENTS. -- This section shall not apply to any payments made pursuant to a transfer described in section 1235(a) (relating to sale or exchange of patents).↩